## Case No. 14,403.

UNION TRUST CO. v. ST. LOUIS, I. M. & S. RY. CO.

[5 Dill. 1.] [1]

Circuit Court, E. D. Missouri. 1878.

RAILROAD COMPANIES—MORTGAGE—FORECLOSURE —EXTENSION OF TIME OF PAYMENT— ESTOPPEL —WAIVER OF PAYMENT AT THE DAY — DEFAULT —COVENANT TO PAY PRIOR MORTGAGES—PRINCIPAL—INTEREST—AMOUNT OF DECREE.

1. Bill to foreclose a mortgage for default in the payment of interest on the railway and appurtenances of the defendant company. The defence was that the promoters of the suit had

1 [Reported by Hon. John F. Dillon. Circuit Judge, and here reprinted by permission.]

extended the time of payment beyond the date at which the suit was brought. The facts relating to this defence stated, and *held* not to amount to an agreement to extend, nor to estop the trustee from maintaining the bill, but only to a waiver of payment of interest at the covenant day, which may be terminated by notice and demand for full payment. Treat, J., dissenting.

2. The mortgage in suit contained, inter alia, a covenant by the defendant company to pay interest on mortgages upon distinct divisions of its road made by separate companies, which were afterwards consolidated into the defendant company; the plaintiff had not paid anything in respect of these divisional mortgages, and the holders thereof were not parties to this suit: *Held,* that no decree of foreclosure could be granted in respect of the default in the payment of interest on the divisional mortgages.

3. The principal sum named in the mortgage in suit not being due, a decree can go only in respect of the interest due and unpaid.

The plaintiff is the trustee in a railway mortgage executed by the St. Louis, Iron Mountain, and Southern Railway Company (the only defendant in the cause), May 6th, 1874, upon six hundred and eighty-six miles of railway and appurtenances, to secure the payment of bonds to the nominal amount of $28,000,000. The defendant company was formed by the consolidation of the St. Louis and Iron Mountain Railroad Company, the Arkansas branch of the same, the Cairo, Arkansas, and Texas Railroad Company, and the Cairo and Fulton Railroad Company, each of which, prior to the creation of the defendant company, had constructed separate lines of railway and mortgaged the same. These companies were merged into the defendant company, which took the property subject to these several mortgages—which will be referred to hereafter as the divisional mortgages—and amounting, at the time, in the aggregate, to $21,689,000. A leading purpose of the mortgage sought to be foreclosed— known as the consolidated mortgage, and which covers all of the property embraced in the several divisional mortgages—was to convert these various mortgage debts into one mortgage debt by an exchange of the consolidated mortgage bonds for the divisional mortgage bonds. For this purpose $23,000,000 of the consolidated bonds were set apart by the consolidated mortgage to be thus exchanged. To raise additional means, to provide "for other existing debts and otherwise," $5,000,000 of the consolidated mortgage bonds were authorized to be sold by the defendant company. The scheme for the exchange of consolidated bonds for divisional bonds failed almost entirely; but a considerable portion of the additional $5,000,000 have been issued, the exact number of bonds outstanding and in the hands of bona fide holders not being stated in the bill, and being a matter of contest between the bondholders. The consolidated mortgage recites these divisional mortgages, and declares the purpose of its execution to be to secure the consolidated bonds proposed to be issued; and, further, to secure the performance of the covenants in respect to a sinking fund to be

commenced January 1st. 1880, in respect of which, however. no question now arises.

The conditions of defeasance in the consolidated mortgage are· (1) Payment of the principal and interest of the consolidated bonds; (2) maintenance of the sinking fund as provided for; (3) performance of the covenants on the part of the defendant railroad company in respect to the payment of taxes; and also, (4) payment of interest by the defendant upon bonds secured by prior divisional mortgages; and, (5) payment or discharge by the defendant of such prior divisional mortgages as might be necessary or material to the protection of the security thereby created. In case of default in the performance of these conditions, the mortgage provides that the trustee may, upon the application of one-eighth of all the then outstanding consolidated bonds, take and hold possession of the mortgaged property, as mortgagees in possession; and in case such default should continue for three months, upon application of the holders of one-eighth of the then outstanding consolidated bonds, to proceed to sell, out of court, in the manner specified.

The defaults alleged in the bill are the failure to pay interest upon the various classes of bonds maturing as follows: One-half interest on St. Louis and Iron Mountain second mortgage. maturing November 1st, 1876; entire interest on St. Louis and Iron Mountain first mortgage, maturing May 1st, 1877; one-half interest on Cairo, Arkansas, and Texas first mortgage, maturing December 1st, 1876; entire interest on Cairo, Arkansas, and Texas first mortgage, maturing June 1st, 1877; one-half interest on St. Louis and Iron Mountain (Arkansas Branch) first mortgage, maturing December 1st, 1876; entire interest on St. Louis and Iron Mountain (Arkansas Branch) first mortgage, maturing June 1st, 1877; one-half interest on Cairo and Fulton first mortgage, maturing January 1st, 1877; entire interest on Cairo and Fulton first mortgage, maturing July 1st, 1877; entire interest on consolidated mortgage. maturing April 1st, 1877; entire interest on St. Louis and Iron Mountain first mortgage, maturing August 1st, 1877. Certain payments were made after the filing of the bill, so that at the hearing of this cause, in April, 1878, the interest due and unpaid, failure to pay which is assigned as defaults, authorizing foreclosure of the consolidated mortgage, was the following —one-half of the interest upon the several classes of bonds maturing as follows: St. Louis and Iron Mountain second mortgage, November 1st, 1877; St. Louis and Iron Mountain, second mortgage, May 1st, 1877; St. Louis and Iron Mountain second mortgage, November 1st, 1877; Cairo, Arkansas, and Texas first mortgage, December 1st, 1876; Cairo, Arkansas, and Texas first mortgage, June 1st, 1877; Cairo, Arkansas, and Texas first mortgage, December 1st, 1877; St. Louis and Iron Mountain (Arkansas Branch) first mortgage, December 1st, 1876;

St. Louis and Iron Mountain (Arkansas Branch) first mortgage, June 1st, 1877; St. Louis and Iron Mountain (Arkansas Branch) first mortgage, December 1st, 1877; Cairo and Fulton first mortgage, January 1st, 1877; Cairo and Fulton first mortgage, July 1st, 1877; Cairo and Fulton first mortgage, January 1st, 1878; Consolidated mortgage, April 1st, 1877; Consolidated mortgage. October 1st, 1877; Consolidated mortgage, April 1st, 1878.

The bill, after alleging the defaults as stated, avers the application of the holders of upwards of one-eighth of all the outstanding consolidated bonds to the complainant trustee to proceed to enforce the consolidated mortgage by entry, and to commence and carry on appropriate proceedings, by suit in equity or otherwise, and "for the foreclosure of said mortgage," and avers the action taken by the trustee "in pursuance of such application and request." There were four applications to the trustee, each of which requested the complainant to commence and carry on appropriate proceedings by suit in equity for the possession of the mortgaged property and foreclosure of the consolidated mortgage—the first dated April 3d, 1877; the second dated May 3d, 1877, signed by "Baring Brothers & Co., by S. G. & G. C. Ward, Attorneys, holders of sixteen hundred and twenty-three of the consolidated bonds of the St. Louis, Iron Mountain, and Southern Railway Company;" the third dated May 7th, 1877; and the fourth dated August 3d, 1877, signed by "Baring Brothers & Co., by S. G. & G. C. Ward, Attorneys, sixteen hundred and twenty-three bonds; Russell Sturgiss, by S. G. & G. C. Ward, Attorneys, twenty-three bonds; Kirkman D. Hodgson, by S. G. & G. C. Ward, Attorneys, fourteen bonds; J. Stewart Hodgson, by S. G. & G. C. Ward, Attorneys, thirteen bonds; Edward C. Baring, by S. G. & G. C. Ward. Attorneys, seventeen bonds; H. Bingham Mildmay, by S. G. & G. C. Ward, Attorneys, seventeen bonds; C. L. Norman, by S. G. & G. C. Ward. Attorneys. nine bonds; Hope & Co., by S. G. & G. C. Ward, Agents, fifty bonds; Louisa, Lady Ashburton, by S. G. & G. C. Ward, Agents. six bonds; Samuel Gray Ward. by ·George Cabot Ward, nine bonds; George Cabot Ward, fourteen bonds; D. G. Bacon, six bonds." Samuel Gray Ward and George Cabot Ward were copartners, and were jointly and severally the attorneys in fact of Kirkman D. Hodgson, Russell Sturgiss, J. Stewart Hodgson, E. C. Baring, H. B. Mildmay, W. Moier, C. L. Norman, and T. C. Baring, individual members of the partnership firm of Baring Brothers & Co., of London, under the power of attorney in evidence; the agency of the Wards, dating from September, 1871, for the firm and for the individual members of Baring Brothers & Co., is conceded by all parties in this proceeding. The Wards were also agents of Hope & Co., from the time Baring Brothers & Co. acquired their Iron Mountain securities. It

also appears that the bonds of Lady Ashburton were held and registered in the name of S. G. & G. C. Ward, Attorneys. Thus it appears that S. G. & G. C. Ward, either personally or individually, held, or as agents or attorneys in fact represented the holders of, every bond subscribing the several applications to the trustee, with the single exception of Mr. D. G. Bacon, and of ten bonds once owned by the complainant. and since sold.

The bill prays: 1. That complainant may be put into possession of the property. 2. That the amount of principal and interest upon the outstanding bonds, issued under and secured by the consolidated mortgage, be ascertained, and payment thereof be ordered to plaintiff. 3. That said consolidated mortgage be decreed a lien on the mortgaged property, and that the company be decreed to pay all moneys now due or to become due and payable under or by virtue of said mortgage. 4. That all the mortgaged property be sold, and the net proceeds, less payments for taxes, assessments, and prior liens, be applied to payment of amounts adjudged due and owing on consolidated bonds and interest, and for general relief.

The answer sets forth the defence with much detail, but it is in substance as follows: Coupons on the several classes of bonds having been funded, in pursuance of the terms of the circular dated February 23d, 1875, it was obligatory upon the company to pay in full its interest coupons upon all classes of bonds maturing on and after November 1st, 1876. That the company, represented by its chief executive officers—Mr. Allen, president, and Mr. Marquand, vice-president,—on and prior to October 12th, 1876, desired and intended to make such payments in full, and was ready and able to do so. That S. G. & G. C. Ward, being consolidated bondholders, and agents and attorneys of other large holders of consolidated bonds (the first coupons of which, due after such intended resumption, matured April 1st, 1877), strenuously opposed payment in full as proposed and intended by the company on November 1st, 1876, when the semi-annual coupons on the St. Louis and Iron Mountain second mortgage matured, followed chronologically by the Cairo, Arkansas, and Texas first mortgage, December 1st, 1876; St. Louis and Iron Mountain (Arkansas Branch) first mortgage, December 1st, 1876; and Cairo and Fulton first mortgage, January 1st, 1877,—all of which were prior to the consolidated coupons in point of lien and time of payment—and instigated and procured the company to pay one-half only of such interest on the prior divisional mortgages, except the interest on the St. Louis and Iron Mountain first mortgage, on and after November 1st, 1876; and to apply the means of the company, which it was designed to use for payment of such interest, to other purposes, being payment of the float-

ing debt and betterment of the mortgaged property, until such time as should be found consistent with the proper management and development of the road, which time was by them suggested as being the close of 1878; and by their words, acts, conduct, and expressions, led the defendant to believe that, in the event such course of action was taken by it, they, as holders of consolidated bonds and representatives of other holders, would withhold any exaction or demand of payment exceeding one-half of coupons of consolidated bonds held or represented by them, maturing on April 1st, 1877, and thereafter, until such period as the income of the road should be adequate to pay them, which period was by them suggested as being November 1st, 1878. That the company, by its executive committee, authorized thereunto, accepted these propositions of the Messrs. Ward, made the agreement as stated, and in good faith has ever since, in all respects, acted upon it, and in so doing has expended its revenue and income, which would have been available and used for payment of interest, for the other purposes indicated, and thereby has irrevocably changed its position, by destroying its credit and by placing beyond recall the moneys disbursed in performance of the plan agreed upon, so that if it should be rescinded or repudiated, the company could not be restored to its former position, and would sustain ruinous and irreparable injury. This defensive matter is set up in the answer as a valid agreement between the bondholders and the company to change the time of paying interest, as well as the amount to be paid; as waiver by the bondholders of strict performance in the payment of interest at the covenant day, and also as an estoppel on them to bring suit on the unpaid half of the coupons of the consolidated mortgage at any time prior to November 1st, 1878.

[For prior proceedings relating to the appointment of a receiver, see Case No. 14,402.]

A general replication was filed, and a voluminous mass of testimony was taken, covering over one thousand five hundred printed pages. The cause is before the court on final hearing.

W. H. Peckham, Evarts. Southmayd & Choate, Henry Hitchcock, G. A. Madill, and Noble & Orrick, for complainant.

Glover & Shepley, Thoroughman & Warren, Ashbell Green, and W. R. Donaldson, for defendant.

Before DILLON, Circuit Judge, and TREAT, District Judge.

DILLON, Circuit Judge. The consolidation of the four companies into the defendant company took place in May, 1874. The total mortgage debt of the constituent companies at that time was the sum of $21,689,000, and the floating debt was over $4,000,000. The

defendant company came into existence under the weight of this heavy indebtedness. To provide for retiring all of the bonds of the several companies and to meet the floating indebtedness, the mortgage in suit, known as the consolidated mortgage, was executed May 6th, 1874, for the nominal sum of $28,-000,000, at seven per cent interest, payable semi-annually, on the first days of April and October. Twenty-three millions of the consolidated bonds were, by the terms of the mortgage, set apart to exchange for the divisional bonds; but very few were ever exchanged, and the main issue of bonds under the consolidated mortgage were out of the surplus of five millions authorized by that instrument to be used to provide for the general wants of the company.

Baring Brothers & Co., large owners of divisional bonds, in August, 1874, to aid the company in meeting its floating debt, purchased sixteen hundred and twenty-three of the consolidated bonds, amounting to $1,623,-000, at seventy-one and one-half cents, currency. These bonds are still owned by this firm, of whom the Messrs. Ward, or rather Mr. Samuel G. Ward, is the American agent, with plenary powers.

As a part of the arrangement by which the sixteen hundred and twenty-three consolidated bonds were taken by the Barings, it was required that Messrs. Allen and Marquand and their friends on this side of the Atlantic should provide for an extension of the floating debt. In order to effect this, Allen and Marquand became endorsers for the company in a large amount. The company was not earning enough to extinguish the floating debt and pay all of its interest; and in February, 1875, the company, finding that the floating debt "interfered with the economy of management and depressed its securities," appealed to the bondholders to fund all of the coupons which would mature down to the last day of October, 1876.

The Barings, owners of five millions or more of the securities of the company, aided this funding scheme, on certain conditions not now material to notice, and it was acquiesced in and distinctly agreed to by the large mass of the bondholders. Mr. Allen and Mr. Marquand, respectively president and vice-president of the company, are also large owners of its securities. The Barings were represented in the board of directors of the company by Mr George C. Ward and by Mr. Morison. The rest of the directors seem to have been friendly to the Allen interest. In the funding scheme of February, 1875, it was promised that on November 1st, 1876, the company would resume the payment in full of interest on all classes of its bonds, divisional and consolidated. The amount of floating liabilities had, by mistake, been under-estimated in the circular of February, 1875, which set forth the funding scheme, and the expected net earnings of the company had fallen short of the estimates.

One of the leading objects of the funding scheme was to extinguish the floating debt, but, owing to the reasons just stated, this expectation had not been realized, for, although this debt had been reduced, it still amounted, on August 31st, 1876, to the sum of $1,702,-778.70. The efficiency of the road, however, had been well maintained; it had a full equipment, and its earnings, under adverse circumstances of an exceptional or accidental character, had constantly increased. The system of railways in Texas with which the defendant's road connected was being gradually developed, and more than compensated the company for the loss of earnings resulting from the depression of the iron industry. The net earnings of the company were not sufficient to extinguish the floating debt, to pay interest in full, and to maintain the road and its equipment in good condition. It was nearly or quite sufficient to pay full interest if it could all be appropriated to that end. The credit of the company was good. About $250,000 of the floating debt was due employes on back pay-rolls; in September, 1876, the men had not been paid for services performed in May. Some of the floating debt bore ten per cent. interest.

Such is a brief outline of the company's condition in the summer of 1876. Up to this time the Barings, represented by the Messrs. Ward, and the management, represented by Mr. Allen, had worked together in harmony. Unfortunately for the great interests here concerned, causes of difference gradually arose, which, in March, 1877, resulted in mutual distrust and alienation. It is not material to any legal question now presented to determine on which side the blame lay.

The duty of the court is to ascertain the legal effect on the rights of the holders of the consolidated bonds of what took place in October, 1876, between the Messrs. Ward, as the representatives of the Barings and certain other bondholders, on the one side, and the defendant company, through its officers, on the other. At this time a radical conflict of views as to the policy to be adopted by the company displayed itself. The parties were still working in concert, and we find no satisfactory proof in this record that at this time each was not acting from a sense of duty and in entire good faith. In the situation of the company's affairs, there was ample room for difference of judgment respecting the course to be pursued. Which would prove to be the wiser, no sagacity could forecast with certainty, for it would depend upon the amount of future earnings, and upon the disposition and views of a large number of creditors, scattered over the world.

It appears, with clearness, that the purpose of the company's officers was to commence to pay interest in full November 1st, 1876, on the expiration of the funding plan. Mr. Allen and several of the directors strongly favored this policy and Mr. Marquand urged it with emphasis. The Messrs. Ward were of a dif-

ferent opinion. They insisted that, as the earnings were not sufficient to pay the floating debt and to pay and continue the payment of interest in full, the true policy was to pay only one-half interest on the great body of the secured indebtedness, and to appropriate the rest of the net earnings to the extinguishment of the floating debt, and to maintaining the efficient condition of the property.

Several hundreds of closely-printed pages of oral evidence touching this difference of opinion, and the views and arguments of the several actors in the transaction, and as to what was intended, have been taken, in portions of which there is considerable conflict. It is not my purpose to refer to this at length, for what was concluded appears in the official records of the company's action, in the circular of President Allen of the 20th day of October, and in the letter of Mr. Samuel G. Ward of October 21st, accompanied by an abstract of Mr. Morison's report on the condition and prospects of the road, of date October 16th, made at the instance of Mr. Ward, and addressed to him, and in the accompanying correspondence. The oral testimony does not vary the legal effect of the record, documentary and written evidence; and it is altogether more satisfactory to make this the basis of judgment than the parol evidence of statements and intentions. To become thoroughly informed concerning the road, its condition, wants, earnings, and prospects, Mr. Samuel G. Ward, for himself, but mainly for the foreign bondholders whose interests he represented, of whom the Barings were the largest, in September, 1876, procured Mr. Morison, a civil engineer of large experience and a director in the company, to make an examination of the road and report the result. Mr. Morison, who had the confidence of Mr. Ward, made such examination and a report dated October 12th, 1876. This report gives a detailed view of the company's situation; and, after referring to the condition of the floating debt and the probable earnings of the road, says: "Under these circumstances, an attempt to pay these maturing obligations in full would lead to a rapid increase, instead of diminution, in the floating debt, and must early result in disaster. While, however, it would appear very unwise to attempt to pay this interest in full, the revenues of the road are sufficient for the payment of a portion of it. The wisest course, in my judgment, would be to continue to pay in full the interest upon the St. Louis and Iron Mountain Railroad first mortgage bonds, and upon the funded interest certificates; to pay one-half of the interest coupons of the several other unconsolidated bonds, while action as regards the consolidated mortgage bonds may safely be suspended to abide the developments of this winter's traffic." (The earliest interest on the consolidated bonds would not fall due until April 1st, 1877.)

His report concluded with this recommendation: "Under the circumstances, it would appear to me most desirable to pay one-half of each coupon of the divisional bonds in gold as they mature, and to issue scrip for the remaining half, such scrip to be redeemed with compound interest at seven per cent before the payment of any dividend upon the stock. The coupons should have the amount paid stamped upon them, and be placed with a trust company as security for the scrip. I see no advantage to be gained by asking the formal approval of the bondholders to this plan, as the implied approval which the acceptance of such half payment would give would be all that is necessary. A circular should be prepared stating the circumstances and expectations of the company, and showing plainly the inability to make payment in full; it should also state that it is the belief of the directors that they will be unable to pay more than one-half of each of the four next maturing coupons, but that after that time they confidently hope to be able to resume payment in full, but it should contain no absolute pledge to that effect, as there are many contingencies attending the development of trade with a newly-settled country, which may vitiate the most careful calculations and overturn the best grounded hopes."

These recommendations had the approval of the Messrs. Ward, and the report was read at the meeting of the board of directors held in the city of New York on the 12th day of October

The Allen party still insisted on the payment of interest in full as the true policy. It seemed to be admitted on all hands that the company could pay interest in full for a few months, but the Wards insisted that it could not continue to do this and do what else ought to be done, while Allen and Marquand and their friends in the directory, urged that what the earnings might fall short could be supplemented by the credit of the company, or by a sale of its remaining consolidated bonds, or in some other way. The Messrs. Ward were firm, and after several meetings of the board and the executive committee, at which the subject was discussed, Mr. Allen finally yielded, and with him the executive committee. Mr. Allen, as president, prepared the circular of October 20th, above referred to, addressed to the bondholders, and read the same to the executive committee, "who unanimously voted to issue it and to send copies to the bondholders."

On motion of Mr. George C. Ward (a member of the executive committee), "the treasurer was authorized to prepare the proper stamps and to mark upon the coupons, as they shall be presented, the one-half payment"

The draft of this circular had been prepared by Mr. Allen on the day before (October 19th), and was on that day submitted to Mr. Samuel G. Ward. The draft thus submitted contained a clause providing that the

·bondholders, on presenting their coupons, would be paid one-half in cash and be given for the unpaid half, at their option, interest-bearing certificates or consolidated mortgage bonds, or the coupons stamped as half paid. Mr. Ward objected to this provision, and it was stricken out from the draft. The draft also stated that the company would follow this course for two years, beginning with November 1st, 1876. This clause also was stricken out on Mr. Ward's objecting to it, so that the draft, as finally amended, simply stated that the company would pay one-half of each coupon as presented, and fixed no time at which the company would pay its coupons in full.

The circular of the president, as thus amended, and as authorized to be issued by the executive committee, is dated October 20th, 1876, addressed "to the bondholders," and, after stating in detail the financial condition and prospects of the company, concludes as follows:

"The floating debt of the company on the 1st of January next will amount to about $1,595,000. It is a variable quantity, more or less of which must always remain with a railroad in operation. About $750,000 of it should be paid in 1877. The interest which will accrue in 1877 upon all kinds of indebtedness, including gold premium, will be about $2,150,000. New constructions, steel rails, and other necessary improvements for the maintenance of the property in good order and efficiency, may require near twelve per cent of the earnings. The operating and general expenses and taxes will consume about fifty per cent. Without a large increase of earnings, therefore, it becomes apparent that the time for the resumption of the payment of the interest in full, with a fair expectation of maintaining it, has not yet arrived. The company will, therefore, pay, on and after November 1st, 1876, all the interest, as heretofore, on the first mortgage (St. Louis and Iron Mountain Railroad bonds), and all interest upon all classes of the funded certificates, and half the interest coupons on other classes of bonds as they mature and are presented for payment. The object of this arrangement is to enable the company the more completely to effect the purpose of the circular of February 23d, 1875, by the continued reduction of debts, and thereby to save a large amount in interest now paid on supply bills, and to effect an important saving in the cost of labor by prompt payment, and to make the renewals, betterments, and constructions which experience may prove to be necessary for the economical and profitable operation of the road."

This circular, it will be perceived, required no consent of the bondholders, or action on their part; nor did it state how long the plan of half payment would continue.

The Messrs. Ward and the officers of the company were still acting in concert: and it was understood that Mr. Samuel G. Ward,

as the main representative of the largest bondholders, would give the plan adopted (which was in reality his own) his public approval, and thus aid in securing the approval of the bondholders at large.

With this view Mr. Ward caused Mr. Morison to make a careful abstract of his report, with some modifications, which was to be sent to the bondholders with a circular-letter of Mr. Ward approving the plan embodied in the above-mentioned circular of President Allen. The portion of the original report of Mr. Morison, above quoted in the abstract prepared to be sent to the bondholders, was changed so as to read as follows:

"This amount of interest will manifestly be materially in excess of any earnings which we can hope for. If the interest on the St. Louis and Iron Mountain Railroad first mortgage bonds and the funded interest certificates were to be paid in full (as had already been done), and one-half of the interest be paid upon the other classes of bonds, the floating debt would be gradually extinguished, and within a reasonable length of time the company might hope to see itself relieved from its embarrassments. Under this course the amount of interest to be paid from this date to and including January 1st, 1877, would be about $530,000; this amount covers the gold premium and the floating debt interest. Should the estimated earnings be realized, there would remain $420,-000, which would suffice to bring up the pay-roll arrears and leave a surplus to be applied to other items of the extended and current debts. The interest to be paid for 1877, including gold premium and floating debt interest, would be about $1,350,000, which would leave a balance of $400,000 from the estimated net revenue, a portion of which would probably be needed for special betterments to meet the growth of traffic, and the remainder could be applied to the floating debt. Before the close of 1878. if the hoped-for growth of business is realized, the full payment of interest could probably be resumed."

It will be seen that this differs materially from the recommendations of the original report to Mr. Ward. That recommended half interest on the divisional bonds for the four next maturing coupons reserving action for the present as respects the consolidated bonds. The original report provided for the issue of scrip for the unpaid half of the four coupons, with a pledge of the coupons in trust as security for the scrip. This provision is omitted from the abstract of the report. The original report expressly named four coupons; this the abstract omits, and in lieu of it contains the vague statement that "before the close of 1878 * * * full payment of interest can probably be resumed."

Mr. Ward prefaced this abstract of Mr. Morison's report with this letter:

"New York, October 21st, 1876. The continued depression of the business of the coun-

try has caused such a disappointment as to the receipts which it seemed reasonable to anticipate for the St. Louis, Iron Mountain, and Southern Railway Company, at the time when the funding arrangement was adopted, as to make it apparent to the directors that it would be premature at this time to resume payment of interest in full. The plan which has been proposed by them of paying one-half the interest in cash, continuing payment in full on the first mortgage bonds and the funding certificates, and at the same time continuing the reduction of the floating debt, and developing the business of the road, in connection with the newly-finished lines leading to it, has had my careful consideration and approval, as the representative of several of the largest bondholders. Since the circular of February, 1875, I have caused thorough examination of the accounts of the road to be made by Mr. William E. Warren; and Mr. George S. Morison has, at my request, made a careful and repeated personal examination of the condition and business of the road; the results of which, up to the latest dates, will be found in his accompanying report to me. With these facts before me, and taking into account the large and growing receipts of the road, at a period of the greatest depression, it has seemed to me that the directors have found the wisest solution of the problem that presents itself, in paying such portion of the interest as can be met consistently with the continued reduction of the floating debt, while keeping up the efficient condition of the property. Samuel. G. Ward."

This letter and the abstract of Mr. Morison's report were printed and sent by Mr. Ward to his principals and to his personal friends among the bondholders; and President Allen's circular of October 20th was likewise printed and sent by the company's officers to all of the holders of divisional and consolidated bonds.

On November 1st. the semi-annual coupons of thirty-five dollars each of the divisional second mortgage bonds of the St. Louis and Iron Mountain Railroad Company fell due. They were presented by the holders, who were paid one-half thereof, and the following words being stamped on the coupons: "Paid $17.50 on this coupon, November, 1876," they were returned to the respective holders. The Messrs. Ward presented coupons owned by themselves and others, and received half payment in this manner without objection. Coupons matured December 1st on the divisional mortgage of the Cairo, Arkansas, and Texas Railroad Company, and also on the Arkansas branch, which were presented and one-half paid, and the coupons stamped as above and returned to the holders. On January 1st, 1877, coupons for interest on the bonds of the Cairo and Fulton divisional mortgage fell due, and on being presented one-half was paid and stamped thereon and returned to the holders. In March, 1877, if not before, a misunderstanding arose between Mr. Samuel G. Ward and Mr. Allen, and when the coupons of the consolidated bonds fell due, April 1st, 1877, Mr. Ward demanded payment in full; the company offered to pay one-half, which was refused, and a bill of foreclosure filed in this court by the trustee, April 6th, 1877, asking for a receiver, which was refused. [Case No. 14,402.]

This bill was afterwards voluntarily dismissed by the trustee, and soon afterwards, viz., August 9th, 1877, the present bill was filed, based on the defaults above mentioned, in paying only one-half of the amount of the coupons on the divisional mortgages and one-half of the coupons due April 1st on the consolidated mortgage, one-half having subsequently been paid and received by the Messrs. Ward under protest, reserving all rights. Meanwhile, since October, 1876, the company has been acting upon the theory that it was only bound to pay one-half, and has been appropriating the residue of the net income to the reduction of the floating debt, giving preference, as the Messrs. Ward complain, to the extinguishment of debts on which Mr. Allen and Mr. Marquand were indorsers, rather than to the payment of arrearages on the pay-rolls.

Upon these facts three questions of law arise: 1. Was there a valid agreement, founded upon a sufficient consideration, whereby the payment of one-half interest on the bonds, both divisional and consolidated, so far as owned or controlled by the Messrs. Ward, was extended to November 1st, 1878? 2. Whether what was thus said and done by the Messrs. Ward in October, 1876, created as to them and their principals an equitable estoppel to instigate and maintain a foreclosure bill prior to November 1st, 1878? 3. If there was no such valid agreement or estoppel, what is the legal effect on the rights of the bondholders of the transactions of October, 1876?

Briefly of these questions in their order: It is to be recollected that the divisional bonds (excluding the Iron Mountain firsts, which were to be paid in full), amounted to about $20,000,000, in some of which the Barings and Wards had but little interest, and in none of which, perhaps, a controlling interest. They did own and control a majority of the consolidated bonds then outstanding. What was finally concluded put the divisional bonds and the consolidated bonds on the same footing.

The Messrs. Ward refused to make any separate arrangement as respects bonds owned and controlled by them different from the other bondholders. There is nothing in the circular of President Allen of October 20th, and nothing in what was done under it, from which it can be claimed that bondholders not represented by the Messrs. Ward had made an agreement to extend the time for the payment of interest. They still hold

their coupons; they have accepted nothing in the place of them; they have simply received one-half of the amount due thereon.

When we consider that the circular of the president (the only act of the company from which any agreement on its part is to be deduced) asks for no extension for any specified time, and for no agreement of any kind from the bondholder, but simply says, "The company will, therefore, pay, on and after November 1st, 1876, * * * half the interest coupons on other classes of bonds as they mature and are presented for payment," it is difficult to see any solid foundation for the claim that there was a contract for a definite extension. This is made more evident from the fact that the words in the original draft of the circular looking to a specific agreement for two years from November 1st, 1876, were stricken out at the instance of Mr. Ward before the circular was adopted by the executive committee.

The question as to the estoppel upon the Messrs. Ward and those whom they represent, is one of much more difficulty. It is clear that the company adopted the plan of half payment of interest against the judgment of its officers, and upon the urgent requirement of Mr. Ward; and that it had appropriated, between that time and April 1st, its earnings to the reduction of the unsecured debts and purposes other than it would have done if it had expected to resume full payment of interest as early as April, 1877.

It is, perhaps, clear enough that it was hoped that the bondholders, at least those represented by the Messrs. Ward, would be content to receive half interest, if the company should continue to desire the indulgence, for the period of two years; but the difficulty is that the Messrs. Ward made no distinct or specific promise to that effect. The company was free to pay in full at any time it might find itself able to do so.

It is also equally clear that if Mr. Allen and the executive committee had anticipated the trouble that afterwards arose, and that full payment would be demanded on and after April next, they would never have consented to the plan urged by Mr. Ward. Grant all this, and that Mr. Ward's subsequent course disappoints expectations which his previous course might justly raise, still this falls short of establishing that he has estopped himself and his principals to enforce the payment of interest on their bonds for two years, when it is evident that such an estoppel would not exist against any other bondholders. All of the bonds were put upon the same footing, and if there is an estoppel upon the Wards and the Barings as respects the consolidated bonds, it equally applies to the divisional bonds owned by them; the result of which would be that a portion of the bondholders would be disabled during two years from enforcing the payment of interest, and the rest not. This was never intended. It is also true that the

changed course of the Messrs. Ward in April, 1877, and subsequently, in demanding full payment of the interest on the consolidated bonds, would, if it had been complied with, have worked injustice to the holders of divisional bonds who had, through the influence of the Messrs. Ward, accepted, in November, December, and January, half payment of their coupons, although these had a prior lien to the consolidated bonds. To pay on the latter interest in full, and only half on the others having a superior lien, would be manifestly inequitable to the holders of the divisional bonds.

The estoppel for the period of two years from November 1st, 1876, fails, because the time during which the payment of half interest should be made was left indefinite. Although this point was not adjudged in the application for the receiver, yet such seems to have been the impression that the transaction, which was then fully brought to view, made upon Mr. Justice Miller, who says that the plan of the Messrs. Ward contemplated "that half of each coupon represented should be paid, relying upon the leniency of the holders for such extension of time as should be necessary or useful." [Case No. 14,402.]

In my view, the true legal effect of what was done by the Messrs. Ward in October, 1876, was, as respects bonds owned or controlled by them, to consent to the company's paying only half interest for an indefinite time, supposed not to exceed two years. They were not bound to wait two years, because they did not so agree or promise; but within that time they could not suddenly terminate the plan which had been entered on, without reasonable or fair notice to the company; and, therefore, it is doubtful whether the first bill filed could have been maintained. Fears that it could not, led, perhaps, to its voluntary dismissal.

But on April 3d, 1877, and constantly thereafter, the company and other bondholders had notice that, so far as the Messrs. Ward and those whom they represented were concerned, the half payment plan was at an end; that full payment of interest would thereafter be, as in fact it was, demanded, and the present suit was not commenced until August, 1877.

The principle on which Albert v. Grosvenor Inv. Co., L. R. 3 Q. B. 123, was decided is applicable here. In that case, on the 28th of August, the day on which, by the terms of the mortgage, an installment was due, the wife of the mortgagor asked the mortgagee to wait until the 11th of September, to which he assented. The mortgage provided that on "default" of payment at the time covenanted, the mortgagee might take possession and sell. On the 7th of September the mortgagee took forcible possession and sold the property. In an action by the mortgagor against the mortgagee to recover damages, it was held that there was no "default," and that a default could not be

predicated of an omission to pay at the covenant day when that "omission was with the concurrence of the other party." In this view Lord Chief Justice Cockburn, and Lush, J., concurred, the latter observing: "Default must mean something wrongful, some omission to do that which ought to have been done by one of the parties, and this cannot be when the omission to make payment has the concurrence of the other party. It is true that the defendants (mortgagees) were not bound by this license or giving of time, as there was no consideration, and they might have revoked it at any time and demanded payment of the installment, and if it had not been paid there would have been a default."

The only failure in the payment of interest on the consolidated mortgage which had occurred when the present bill was filed was in respect of the April, 1877, coupons. The defaults in the payment of interest on the divisional bonds, from the very nature of the case, are not available in this suit (which is solely on the consolidated mortgage) as the basis of a decree of foreclosure. The complainant has not paid the divisional bondholders, so as to become subrogated to their rights. And if it had, such rights pertain and are limited to separate divisions of the road, and must be asserted against the specific property mortgaged. We cannot decree to the complainant in this suit any sum in respect of the defaults on the divisional mortgages, since it has no right to receive the money due on those mortgages; and the court on this bill has no authority to order the sale of specific property covered by the several divisional mortgages:

The complainant, as the trustee representing all the bondholders, is only entitled to a decree as respects the non-payment of interest on the consolidated mortgage. There is no provision in the instrument that a default in the payment of interest will cause the principal sum to fall due; and hence, there can in no event be a foreclosure except for the interest due and unpaid on the consolidated mortgage. Judge Treat is of the opinion that the transactions of October, 1876, work an equitable estoppel on the promoters of this suit to maintain it, and, if desired, we will finally certify a division of opinion on this point to the supreme court. Meanwhile, the cause will stand for further hearing as to the contested bonds, or be referred to a master to state an account and report.

TREAT, District Judge (dissenting). A large mass of evidence has been presented, and many points suggested, which, in the view I take of the case, are of little moment, so far as the principal controversy is concerned, viz., the right of the complainant to the foreclosure sought under the facts and circumstances developed.

As to the advisability of the plan adopted in October, 1876, with respect to payment of half interest, or the comparative merits of the various schemes suggested at that time, this court has nothing to do, further than they tend to show the nature and extent of the conclusion reached and its operative effect in law or equity. It may be that Allen and Marquand were too sanguine and the Wards too timid, but no comments upon that point are required. Parties interested in a common enterprise of great magnitude may fairly and justly differ as to the best plan for present and future operations, especially when their conclusions must be based, to a large extent, upon prospective earnings, etc. Such differences are natural, and are in no way censurable; for one important purpose in having a board of direction, instead of a single manager, is to secure the benefits resulting from the respective views of many minds. The then condition of the defendant, and its estimated income, justified an honest difference of opinion.

The following brief statement of facts, as established by the evidence, suggests the rules of law and equity by which the case should be controlled.

The defendant corporation came into existence by the consolidation of several distinct corporations, each of which owned some part of the main line, or some of the branches. Each of said distinct corporations owed bonded and other debts. To provide for those debts, this defendant formed the plan, sufficiently explained in the mortgage now made the basis of this suit, reciting the indebtedness of each of the prior corporations, and setting apart twenty-three of the twenty-eight millions of consolidated bonds for the redemption or exchange of divisional bonds. It seems to have been then supposed that the holders of the latter bonds could be induced to make the desired exchange. In that the defendant was disappointed, for only a few bonds were so exchanged. The five millions in consolidated bonds, not reserved out of the twenty-eight as just stated, would be needed to complete the work contemplated and pay the floating debt.

In that condition of affairs, the defendant, early in 1875, became unable to prosecute its work, pay the floating debt, and meet the interest on the consolidated and divisional bonds. To provide for the difficulty, it was agreed to fund coupons falling due prior to November, 1876, issuing therefor fund certificates running for several years and bearing semi-annual interest.

As early as September, 1876, the parties commenced suggesting plans with respect to the payment of interest falling due after October of that year. The prior funding plan embraced no coupons falling due after October, and evidently contemplated that subsequent thereto interest as it matured would be promptly paid in full.

The Wards represented large interests, and had caused Mr. Warren, and subsequently Mr. Morison, to make full and careful exami-

nations into the condition and prospects of the road. Before Mr. Morison had finished his work, Mr. George C. Ward had suggested the propriety of funding one more of each of the series of coupons. He was a director of the defendant, and also a member of the co-partnership of S. G. & G. C. Ward. His suggestion received no support. Allen, the president of the defendant, H. G. Marquand, vice-president, and the majority of the directors, insisted upon full payment of all interest as it thereafter matured. To meet objections raised principally by the Wards, who were of opinion that payment in full could not be maintained, Allen and Marquand made many suggestions. The Wards, for themselves and the Barings, deemed it very important that the large floating debt should be reduced, and the needed betterments secured, which objects they supposed could not be effected if interest were paid in full. They preferred the plan of paying only half interest. On the return of Mr. Morison to New York, where the board was to meet, he made a full and careful report to Mr. S. G. Ward, who had the more immediate charge of the Barings' interests. In that report half payments were suggested for at least two years, with a certificate for the other half, bearing compound interest. The result of all the discussions was that Allen, Marquand, and the other members of the board (a majority aganist its expressed views), consented to the plan finally urged by S. G. Ward, which was the payment of half interest for an indefinite period of time, with the expectation that full resumption could be had late in 1878, but the defendant to be left free to resume in full at an earlier day if practicable.

It is unnecessary to enter upon a critical examination of the various plans suggested and of the modifications proposed from time to time. When a draft of the plan to be issued in the form of a circular to the bond-holders was submitted by Mr. Allen to Mr. S. G. Ward, the latter caused to be erased all other provisions than what announced the proposed payment of only one-half interest, except on the Iron Mountain firsts and the funded certificates. What thus occurred is very significant. It is evident that Mr. Allen was anxious to the last to use some of the consolidated bonds, unissued, to meet the then condition of affairs; for he and Marquand had zealously urged that full payments would appreciate the securities, whereby the unissued bonds could be utilized.

Mr. Morison states what occurred at that interview, as to the draft of the circular, viz.: "Mr. Allen read the draft of a circular to be sent to the bondholders, and various changes were made in this draft as he read it; there were some small changes in some of the figures and estimates, though none that were material. The draft of the circular contained a clause providing that the bondholders, on presenting their coupons, would be paid one-half in cash and be given for the unpaid half, at their option, interest-bearing certificates or consolidated mortgage bonds, or the coupons stamped as half paid; Mr. Ward objected to this provision, and it was stricken out from the draft. The draft also stated that the company would follow this course for two years, beginning with November 1st, 1876. This clause was also stricken out on Mr. Ward objecting to it; so that the draft, as finally amended, simply stated that the company would pay one-half of each coupon as presented, and fixed no time at which the company would pay its coupons in full."

The conferences, correspondence, and expressed views of the several parties, before the defendant's circular was issued, October 20th, 1876, as well as the apprehensions expressed by Allen and Marquand concerning the plan after its adoption, and S. G. Ward's replies thereto, render the foregoing statement by Mr. Morison not only credible, but entirely consistent with the views and conduct of the negotiating parties.

It must be borne in mind that several of the sets of coupons under consideration were attached to securities prior in right to the consolidated mortgage, although they pertained to separate divisions of the road only. Hence, it might have well been doubted whether the holders of those coupons, who had refused to exchange them and the bonds to which they were attached for consolidated bonds and coupons, would be content to have them put on a par with the consolidated coupons. Why should they receive half payments only, and the subsequent or consolidated security receive the same? Why not stand on their strict rights?

In that connection, it was promised by S. G. Ward that he would issue, simultaneously with the defendant's circular, a circular signed by himself endorsing the plan, and that his recommendation as the representative of large interests, he declared, would probably induce general assent to the plan adopted. His circular was to be accompanied by an abstract of Morison's report; and was issued accordingly, and so accompanied.

Pursuant to that plan, the defendant paid one-half of each coupon up to April, 1877, stamping on each, as presented, half paid, and leaving the coupon so stamped in the hands of the holder. Instead of paying the other half, it applied the surplus funds to the reduction of the floating debt, etc.

Semi-annual coupons on the consolidated mortgage which fell due April 1st, 1877, so far as controlled by the Wards, were presented to defendant and full payment then demanded. The defendant offered to pay one-half, which offer was refused. Promptly thereafter, a bill to foreclose the consolidated mortgage was filed in this court, an application for receiver made and refused, and the suit left pending until August, 1877, when it was dismissed and the present bill filed. In the meantime, the defendant failed to pay any sum on the divisional coupons maturing,

but since this suit was brought, and before the hearing, paid one-half, which was received under protest, etc.

These are the salient facts; and to my mind they establish not a contract between the defendant and the body of the bondholders to postpone half payment for two years, or for any specified time, but they do show an agreement or assent on the part of the defendant and the Wards, in behalf of those whom they represented, that they, at least, would not interfere with defendant in consequence of its failure or refusal to pay more than one-half on maturing coupons, leaving the defendant to pay the other half as soon as it could justifiably do so, even within six months or a year, if it desired.

Hence the statute of frauds has no application to the case. The distinction is a clear one as to an agreement between defendant and the Wards, concerning their respective rights and obligations, inter sese, and an agreement between defendant and all the bondholders The Wards did not represent all bondholders, and could bind only those whom they did represent.

When they induced and endorsed the plan, they purposely caused it, unlike the funding agreement of 1875, not to depend, so far as they were concerned, on the assent of eighty per cent or of any specified number of bondholders. The vice of the argument, it seems to me, springs from a failure to observe the broad distinction mentioned.

Other bondholders did not enter into a specific agreement, oral or otherwise, to postpone full payment of their coupons, and hence, as to them, the doctrine of license or dispensation may have some force. When they become promoters of a suit, that question will arise and may have to be determined, for this suit is not based "on the option" of plaintiff as trustee, but on the request of the prescribed one-eighth of the bondholders.

But if the statute of frauds could be invoked, it would not apply, because: 1. The deferred payment was not necessarily for two years, but as the Wards compelled it to be made, viz., for an indefinite time, with leave to defendant to resume in full within one year. McPherson v. Cox, 96 U. S. 404; Walker v. Johnson, Id. 424. 2. There was assent in writing by S. G. Ward to the written circular of the defendant, as evidenced by his circular and many letters. There was a printed proposal by defendant, and a printed and published endorsement and assent by S. G. Ward, which would affect the interests represented by him.

If the statute of frauds, however, were applicable, the defence is complete on the ground of equitable estoppel; and all the elements of which appear from the foregoing statement of facts

This suit is based on the consolidated mortgage, and at the time it was brought only one set of coupons, that of April, 1877, had matured. If a foreclosure were to be decreed it could be only for the amount of the default in such payment. What may have been the rights of the plaintiff (the trust company), if any, as to taking possession, etc., on breach of covenant to keep down prior incumbrances, such a breach cannot be ground for an independent suit for foreclosure under the consolidated mortgage; for the foreclosure would still leave outstanding all prior mortgages, which are respectively on separate divisions of the road and not on the whole road. Under those prior mortgages, there would have to be distinct suits as to each division, no one division being bound for a mortgage on another. The plaintiff in this suit is in no sense the assignee of the other mortgagees, nor has he been in any manner subrogated to their rights. And even if he were, he could not consolidate such rights, and bring one suit on all of the divisional mortgages against the whole road, instead of separate suits against each division. The plaintiff did not pay the coupons on the divisional mortgages, nor, as trustee under the consolidated mortgage, had he power to do so. A failure to pay coupons on the divisional mortgages did not vest the trustee under the consolidated mortgage with a right to foreclose under the divisional mortgages. If no such right exists, then the basis of this suit was solely the non-payment in full of the April coupons on the consolidated mortgage and non-compliance with mortgage covenants. Payment of one-half of the coupons under the consolidated mortgage was tendered and refused.

The plaintiff is in no better position under the present than under the former bill. The court should therefore eliminate from the case all other grounds of default; for parties in interest under the divisional mortgages are not here complaining. Looking, then, solely to that alleged default, and to what occurred in October, 1876, between the Wards and the defendant, and to the other evident fact that, omitting the Wards, the required one-eighth have not promoted this suit, it must be decided whether the relief asked can be granted according to equitable rules. This is not a controversy between the Barings (or Wards) and Allen and Marquand; but a suit between the trustee and the defendant corporation. There are larger interests at stake than are represented by those persons as private individuals. The directors of the defendant are trustees of the stockholders, all of whose rights are sought to be destroyed. If the right to foreclose exists, it must be enforced, even if so disastrous a result follows. But a court of equity should, when such a catastrophe is probable, and perhaps unnecessary, investigate most rigidly the grounds on which the alleged right is based so that the enforcement of a pretended equitable right may not be productive of gross inequity.

Whatever view may be taken concerning

the October plan and the course pursued thereunder, without objection and with the full assent, at least, of the Wards, their conduct in April involved, among other inequitable results, extreme injustice towards the holders of divisional coupons. The latter had a prior right to payment in full, but had been induced to forego that right for a time. Until full payment to them, in strict law there should have been no payment on the consolidated coupons. But when they had been induced—say, at the instance of the Wards—to postpone the assertion of their full rights, and the time had come, in April, 1877, when the consolidated coupons could be presented for payment for the first time, is it not clear that if the demand of the Wards had been acceded to, and full payment made, an unjust and inequitable advantage would have been granted? Suppose the arrangement had never been made, and yet only half payment had on the divisional coupons —and then suppose the holders of those coupons were lulled to sleep by a vague understanding or a positive statement that no more could be paid, consistently with the interests of all concerned—and then suppose the holders of the consolidated coupons in April demanded full payment of their coupons—what would, in strict justice, have been the duty of the defendant, if it had not ample funds to meet all of its bonded requirements? Should it not have replied that, before you are paid anything, we must pay in full the other and prior sets of coupons? If, on the other hand, it had acceded to the request of the Wards, would it not have enabled them to secure full payment at the expense of others, prior in right? If the defendant is unable to stagger, as is urged, under its bonded indebtedness and accruing interest, where were the fairness and honesty of absorbing its assets in the payment of interest on the last in right, and leaving the other, prior in right, unsatisfied? Certainly, it could not have been a part of the October plan to have such injustice wrought? If so, it fraudulently concealed such plan from the unsuspecting holders of divisional bonds, and the party thereto would be estopped, even under the narrowest rules on the subject.

The case, however, is one where the defendant was induced, by the persistent course of the promovents, to adopt a plan of action, in the pursuit of which it became unable to meet the changed course they required. They now seek to escape from their promises, and take advantage of what they caused to be done, to the probable ruin of the defendant corporation, and, possibly, the divisional interests.

There are many minor questions presented in the arguments which it is unnecessary to comment upon.

What was reasonable notice that the October agreement was at an end? Was it to demand full payment on the consolidated mortgage when the April coupons fell due in 1877, on the very day when they fell due, although bondholders prior in right had by the promovents been induced to accept half payments? If no such practical fraud was permissible, how do these promovents better their standing by dismissing their original bill, and, when further payments on the divisional mortgages had not been made, and no further payment on the consolidated was due, by proceeding de novo, on the ground that only half payments were made under the divisional mortgages, etc.?

Is the basis of the new right the demand in April for full payments of the sums due under the consolidated mortgage? That demand was not then enforceable. Since then, and prior to the filing of this bill, no interest had fallen due under that mortgage. But interest had fallen due under the divisional mortgages, and the covenants in the consolidated mortgage required that interest to be kept down. The failure to keep down that interest would, of course, have been a breach of the mortgage covenants, unless waived. Was it not waived under the facts in evidence?

It is not my purpose to go further into details. It seems to me that, under the recognized doctrine of equitable estoppel, this action cannot be maintained. If different views obtain, the practical workings of this suit under a decree, looking to all the legal and equitable rights involved, will only wreck the defendant, to the destruction of interests resting on the consolidated mortgage, and possibly the divisional mortgages. Well might this plaintiff, as trustee under the consolidated mortgage, shrink from instituting this suit, on its own motion, and base its conduct on the request of the enumerated one-eighth in interest. True, courts do not fail to enforce the clear rights of parties because the course sought might not be the most prudent for them; but when the larger interests of many persons are involved in the fate of a common enterprise, they should carefully ascertain what are the rights of the contestants, and not decree forfeitures against the equities of the case, to the unnecessary destruction of interests not represented.

The value of the defendant's enterprise evidently rests, to a large extent, upon the consolidation of the various parts or divisions.

That I may be clearly understood, let it be borne in mind that, despite the arrangement in 1876, the bill filed in April, 1877, proceeded on the ground that only half interest had been paid on the divisional coupons, and only half tendered on the April coupons under the consolidated mortgage. The parties to the divisional mortgages had made no complaint, and were not before the court complaining of what had not been done at the instance of their promovents. Hence, the doctrine of waiver applies to them. As

stated in the opinion of my brother judge, it was doubtful if these promovents could have maintained the bill filed in April (and I doubt not that it could not have been maintained)—how, then, is their position improved under this bill? The promovents had, in April, 1877, instituted proceedings for foreclosure on the ground of only half payments on divisional coupons, and, substantially, on consolidated coupons due in April; consequently, the defendant was, by such suit, put in the embarrassing condition to pay thereafter, in violation of the understanding, no coupon falling due until the litigation was ended, or of paying half interest according to the understanding, or of paying full interest. It stood still, waiting the action and orders of the court.

After this new suit, it did pay the half interest without waiting for the orders of the court; thus preserving its original status or rights under the agreement of 1876. If the relationship of the parties under the divisional mortgages and the consolidated mortgage are observed (the former waiving or not complaining), then the action of these promovents under the latter mortgage, seeking mainly, from non-payment of divisional coupons, to enforce their subsequent mortgage, we will have a clearer view of the supposed equities on which this bill is based. True, it was important to the bondholders under the consolidated mortgage that the interest on the divisional mortgages should be paid at maturity; and it is equally true that to give value to the former, under this uncompleted enterprise, the payment in full under the latter should be delayed. Where that delay was caused by the former (so far as these promovents are concerned), for their special benefit, why should they be heard to assert in a court of equity that what was done at their special instance and request, for their alleged benefit, gave them a right to take advantage of their own wrong, to the destruction, it may be, not of the interests of the stockholders alone, but also of the holders of other bonds. I refrain from amplifying further. My opinion is that the bill should be dismissed.

Interlocutory decree.

NOTE. The following decree was entered, in accordance with the opinion of the circuit judge:

"It is found that the equities in this case are with the complainant, and that the defendant is in default of the interest coupons upon the bonds secured by the consolidated mortgage described in the bill, which coupons matured and fell due on the 1st of April, 1877, and that the complainant is entitled to recover the amount thereof.

"And it is further adjudged and decreed that it be referred to a master, to inquire, compute, and report to the court what amount is due and unpaid on such of said coupons as matured on the 1st day of April, A. D. 1877.

"And it is further ordered that said master do compute and report to the court what amount is due and unpaid on such of said coupons as shall have matured after the 1st day of April, 1877, and which remain unpaid to the date of the filing of the report of said master; and that the said master, in computing the amounts of such coupons as aforesaid, do separately compute the amounts of all such of said coupons, if any, whereof the ownership or the title thereto may be contested before him; also that the said master ascertain and report what persons were, at the date of filing said bill, and also what persons now are, the bona fide holders and owners of all outstanding bonds claimed to be secured by said consolidated mortgage, and that the complainant have leave to contest before the master the right of any person claiming to be a bona fide holder of any of such bonds.

"And it is further ordered that any person who may be a bona fide holder and entitled to any of the bonds or coupons secured by said consolidated mortgage, be permitted to intervene and contest before the master any claim of any other person to be the bona fide holder of any of such bonds or coupons, claimed to be outstanding, and that the master take proof and report as to the ownership of any bonds so contested before him, and also as to the ownership of any coupons which may be or may have been attached to any of said bonds secured, or claimed to be secured, by said consolidated mortgage, of which coupons the ownership may be contested before him. And for the better discovery of the matters aforesaid, the parties are to produce before the master, upon oath, all deeds, books, papers, and writings in their custody or power relating thereto, and are to be examined, etc., as the said master shall direct.

"And the consideration of all further questions in the cause is reserved; and it is further ordered that the complainant shall be at liberty to apply to this court, or to either of the judges at chambers, at any time as it may be advised, for any further order in the premises."

The cause was soon afterwards settled by the parties, and the bill voluntarily dismissed by the complainant.